UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CR-20318-MARTINEZ/GOODMAN

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

WALTER ALEXANDER LISTA,

    *Defendant.*

_____/

## DEFENDANT'S MOTION TO DISMISS IN WHOLE OR IN PART COUNTS 1, 3, 6, 10 AND 12 OF THE INDICTMENT OR, IN THE ALTERNATIVE, TO STRIKE ALL ALLEGATIONS RELATING TO A 1997 JEEP WRANGLER AND INCORPORATED MEMORANDUM OF LAW

Defendant WALTER ALEXANDER LISTA, through undersigned counsel, respectfully moves this Court, pursuant to Fed. R. Crim. P. 7(d), 12(b)(2), 12(b)(3)(B), for order dismissing or striking, in whole or in part, Counts 1, 3, 6, 10 and 12 of the Indictment for: (1) the failure to state cognizable offense; (2) due process (entrapment by estoppel); and (3) due process (the "perjury trap" perpetrated by the Bankruptcy Trustee). The Defendant further requests an evidentiary hearing on this motion. In support of these requests, the Defendant submits the following memorandum of law.

Part I describes the relevant allegations in the Indictment, Statement of Financial Affairs ("SOFA") and relevant transcripts before the Bankruptcy Trustee.[1]

Part II demonstrates that the allegations concerning the Jeep Wrangler fail to state offenses, because at the time of the bankruptcy filing: (A) he was not required to disclose the Jeep Wrangler because he did not "own" it, although it was technically "titled" in his name at one time; and (B) any failure to disclose any interest in the Jeep Wrangler was immaterial as a matter of law because it had only a nominal value and, at best, had a value ($1,500), which was less than the Bankruptcy Trustee expressly informed the Defendant was "significant" enough to disclose (assets over $3,000).

Part III demonstrates that these allegations should be either dismissed or stricken under the doctrine of "entrapment by estoppel," because the Bankruptcy Trustee expressly told the Defendant during a hearing on July 9, 2013, that he was

---

[1] In considering the Defendant's motion to dismiss, it is appropriate that the Court consider the SOFA and meeting transcripts because they are expressly referred to in the Indictment. *See United States v.* Naegele, 341 B.R. 349,360-62 (D.D.C. 2006) (relying on transcript of creditors' meeting in deciding motion to dismiss § 152 charges); United *States v. General Dynamics Corp.*, 644 F. Supp. 1497, 1499-1501 (C.D. Cal. 1986) (rejecting government's argument that the underlying defense contract could not be considered in deciding a motion to dismiss fraud charges), *rev'd on other grounds*, 828 F.2d 1356 (9th Cir. 1987). *Accord United States v. Bryant*, 556 F. Supp. 2d 378, 438 n. 31 (D. N.J. 2008). *See generally United States v. Adkinson*, 135 F.3d 1363, 1369, n. 11 (11th Cir. 1998) (district courts have the authority to adjudicate defenses pretrial so long as the merits are "'capable of determination without the trial of the general issue," citing Fed. R. Crim. P. 12(b)(2)). *Accord United States v. Coia*, 719 F.2d 1120 (11th Cir. 1983).

only interested in the disclosure of assets of "significant" value, which he defined as over $3,000.

Part IV demonstrates that these allegations should be either dismissed or stricken, because the Bankruptcy Trustee engaged in a forbidden "perjury trap" during the two relevant hearings in this matter.

**MEMORANDUM**

I.   **THE JEEP ALLEGATIONS FAIL TO STATE COGNIZABLE OFFENSES**

A.   **The Jeep Allegations in the Indictment**

The "General Allegations" in the Indictment set the stage in this case by indicating that the charges are based, in substantial part, on the alleged statements made by the Defendant in both the initial and amended SOFAs.  Indictment, p. 2-4, ¶¶ 6, 11, 12-14. The General Allegations concede that the Defendant in fact declared, and made available to his creditors, a total of $2,515,038.00 of non-exempt assets. *See* Indictment, pp. 3-4, ¶¶ 11-13.

Count 1 alleges that the Defendant conspired under 18 U.S.C. § 371 to commit bankruptcy fraud in violation of 18 U.S.C. § 152(7) by "transfer[ring]" and "conceal[ing]" "property of W.A. LISTA," including "a 1997 Jeep Wrangler." Indictment, pp. 4-5, ¶ 2.  Overt Act No. 1 of Count 1 alleges more precisely that on May 3, 2013, the Defendant "transferred *title*" of the Jeep to a coconspirator, but says

-3-

nothing about whether, in fact, the Defendant was the true "owner" of the vehicle during a relevant time period.[2] Indictment, p. 5 (emphasis added). Overt Act 11 then alleges that on July 9, 2013, the Defendant "falsely testified under oath in a 341 bankruptcy meeting conducted by counsel for the bankruptcy trustee that the Jeep Wrangler was never *titled* in his name." Indictment, p. 6 (emphasis added).

Several of the remaining substantive counts mirror these allegations. Count 3 thus alleges that the Defendant violated § 152(7) by "transfer[ring] and conceal[ing]" the Jeep. Indictment, p. 7.  Counts 6, 10 and 12 allege that the Defendant "made a false oath" in the SOFAs "by failing to declare" that he "owned" the Jeep when in truth he was the owner. Indictment, pp. 8-9.[3]

### B.   The 341 "Meeting of Creditors" on July 9, 2013

As noted in the Indictment, on July 9, 2013, the Bankruptcy Trustee convened the 341 meeting of creditors in the U.S. Bankruptcy Court for the Southern District of Florida during which the Defendant was questioned under oath by the Trustee, his attorney and three creditors. *See* **Exhibit 2**, Transcript (07/09/13). During the initial

---

[2] As discussed *infra*, property law distinguishes between true "ownership" from merely holding "title" to an asset. Sometimes the two overlap, but sometimes, as in this case, they do not.

[3] Attached hereto as **Exhibit 1** is a copy of the initial SOFA and Schedules. We request that the Court take judicial notice of the initial and amended SOFAs, all of which were filed in the bankruptcy proceeding which itself is repeatedly referenced in the Indictment.

portion of the hearing, under questioning by the Trustee, the Defendant denied that he "owned" any vehicle other than a Ford F-250. *Id.*, p. 13. Under further questioning by the Trustee, the Defendant again denied having "own[ed]" the Jeep, stating: "No, that's been my father's Jeep." *Id.*, p. 25.

At that point the Trustee shifted – we submit deliberately – to asking multiple questions about whether the Jeep was ever "titled" in the Defendant's name. The first time the Trustee asked about the title, the Defendant denied that the title was in his name and explained that it was really his father's car and that he and other family members "drove" and "used" it until his aunt [Isabel Edwards-Sullivan] bought a house in St. Augustine and "had the Jeep transferred to her, and she took it to St. Augustine." *Id.*, pp. 25-26.

Shortly thereafter, the Trustee changed gears and questioned the Defendant about any "personal property" that he may have sold. *Id.*, p. 26. At that point, the Trustee explicitly narrowed the assets he is interested in by dollar amount:

Q.    So to the best of your recollection, no?

A.    Nothing of any significant value.

Q.    Well, what's significant?

A.    Less than $100 – more than $100.

Q.    Okay. ***I'll even do better than that. I'll say $3,000***.

A.    Okay.

*Id.*, p. 27 (emphasis added).  Not one of the three creditors (or their attorneys), who were present, objected to the Trustee's dollar limitation.

## C.    The 2004 Examination of Walter Lista on October 28, 2013

On October 28, 2013, the Defendant was again questioned about his assets, this time by counsel for the Trustee (Eric J. Silver, Esq.) rather than the Trustee personally. *See* **Exhibit 3**, Transcript (10/28/13). When Mr. Silver initially asked about any vehicles the Defendant "used," the Defendant explained that he used his parents' and wife's vehicles, listing them. *Id.*, pp. 40-41.  When Mr. Silver started to change the subject to the Defendant's business interests, the Defendant interrupted, stating "I'd like to keep going with the cars, because I feel that you're trying to pinpoint me in a direction that might not be accurate."  Mr. Silver then allowed the Defendant to explain:

> You're asking me [about] my father's vehicles. My father has had a long history of titling his vehicles in his name, but allowing my aunts and uncles to use them. Since this problem with the titles has happened back and forth a lot, and you're asking me who owns what vehicle, ***I'm telling you that my father owns a Jeep vehicle, when it might still be titled to my sister***.

*Id.*, p. 42 (emphasis added). However, the Defendant again denied having any vehicles "in my name" other than the Ford, which was "the vehicle I've always

-6-

driven... I want to clarity that that's been my primary vehicle for ten years." *Id.*, pp. 42-43.[4/]

When Mr. Silver again attempted to change the line of questioning, the Defendant again interrupted, stating "I really want to clarify the vehicle situation." Continuing to focus on who the Jeep was "titled" to rather than who "owned it," Mr. Silver reiterated that the Defendant had stated that the only vehicle to which he had a "title" was the Ford. Fearing that he had been mistaken about which sibling the father had titled the Jeep, the Defendant tried to learn what information or documents Mr. Silver actually had, but Mr. Silver *deliberately* obfuscated the issue:

> A.  ***I have understood from you guys that there's a vehicle titled in my name that I'm not aware of.  I don't want this to be a mismatch of statements.  If there's a title to a vehicle, the Jeep, that you claim is titled in my name, I'd like to see a document showing that it's titled in my name***.

> Q.  ***I don't have any document <u>in front of me or in front of you right now</u> that says otherwise.***  I'm asking you for your honest and truthful testimony, and I'm presuming that you're giving it to me.

---

[4/] Although it cannot technically be considered in a motion to dismiss, the Defendant's testimony concerning the Jeep was consistent with testimony given by his mother, Marta Lista on September 18, 2013. Mrs. Lista testified that the Jeep was her husband's vehicle, although it was in the Defendant's name. *See* **Exhibit 4**, Transcript Excerpt (09/18/13), pp. 72-73. *See also id.,* p. 118 ("...the jeep belongs to my husband").

A.      Yes. ***I have not personally put my name on the title on a Jeep, on a vehicle that I did not pay for or own***.  I have some documents maybe you want to see to that effect.

Q.      Sure.

A.      I don't know why the Jeep has become such a big title issue.

Q.      What have you passed me?

A.      I have passed you – since the title issue of the Jeep became a big issue, I have passed you some documents my parents gave me, which is ***a CarMax value of the Jeep showing $1,500***. I have understood that the title says that the Jeep is valued at $16,700, when it is not. I have insurance showing Aidan Sullivan [his uncle] owns the vehicle, not me I also have the mileage.... There's also the mileage on the Jeep showing the Jeep was in St. Augustine, and in the last eight years has been driven less than 1,000 miles per year. So I just want to make sure I clarify that the Jeep is not mine.

*Id.*, pp. 43-45 (emphasis added).[5]

At that point, instead of pressing the Defendant about the "ownership" of the Jeep – the only relevant issue for the bankruptcy proceeding – Mr. Silver continued to focus solely on the "title" and again refused to show the Defendant any evidence he had about the title:

Q.      Has it ever been titled in your name, the Jeep?

A.      I don't know that.  ***If you have some document, I'd like to make sure I'm answering you as truthfully as possible, because I don't recall***.

---

[5] In 2013, the Defendant's aunt and uncle were 72 and 61 years old, respectively.

*Id.*, p. 45 (emphasis added).

Instead of showing the Defendant the 2006 title to the Jeep, which it seems clear that the Trustee and Mr. Silver had all along (which indeed shows that the title was in the Defendant's name), Mr. Silver instead marked the CarMax and insurance documents as Exhibit 5. Mr. Silver then stated on the record that the CarMax appraisal, dated October 26, 2013, was for only $1,500. *Id.*, p. 46. Mr. Silver also put on the record that the documents showed that: (1) the Defendant's aunt and uncle had taken out the insurance for the Jeep from St. Augustine from October 13, 2011 to April 13, 2012; (2) the Defendants had then insured the Jeep from April 22, 2012 until October 2012; and (3) a vehicle history report showed that the Jeep had crashed four times. *Id.*, p. 46.[6] A copy of Exhibit 5 is attached hereto as **Exhibit 5**.[7]

The focus then shifted to questions about businesses. However, the subject of the Jeep eventually arose one more time – when the Defendant denied having "transferred" the Jeep. *Id.*, p. 118. On May 3, 2013, Walter L. Lista, the Defendant's father, forged the Defendant's name on a power of attorney and on a new registration, purporting to transfer "title" from the Defendant to himself. *See* **Exhibit 6**.

---

[6] Courts have recognized that the "blue book" value of a vehicle may actually overstate its market value, especially when "the analysis failed to take into account excess mileage and damage to the vehicle." *In re Guthrie*, 265 B.R. 253, 261-62 (Bkrtcy. M.D. Ala. 2001).

[7] The CarMax appraisal also noted that the Jeep had been driven 149,495 miles.

## II.   OWNERSHIP, MATERIALITY AND INTENT TO DEFRAUD

In order to convict the Defendant of bankruptcy fraud under § 152, the government must prove (1) the existence of the bankruptcy proceedings; (2) that a statement under penalty of perjury was made therein, or in relation thereto; (3) that the statement was made as to a material fact; (4) that the statement was false; and (5) that the statement was knowingly and fraudulently made. *See United States v. Lindholm*, 24 F.3d 1078 (9th Cir. 1994); *Metheany v. United States,* 390 F.2d 559, 561 (9th Cir.1968), *cert. denied,* 393 U.S. 824. The materiality of a false statement in a bankruptcy case is, at least as a threshold matter, a question of law. *See Lindholm*, 24 F.3d at 561; *United States v. Key,* 859 F.2d 1257, 1261 (7th Cir.1988); *see also Metheany,* 390 F.2d at 561.

### A.   "Ownership" of the Jeep

A debtor only has a duty to disclose and include in a bankruptcy proceeding assets that are the "property of the estate." 11 U.S.C. § 362(a)(3). In making that determination, courts look to the definition of property defined by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). Since the Defendant was not the "owner" of the Jeep during the relevant time period covered by the SOFA, both his failure to disclose it and any false statements made about whether he held "title" to the Jeep were immaterial as a matter of law.

-10-

Although the law presumes that the title holder of property is the "owner," the presumption is rebuttable. Thus, "[a] Florida certificate of title for a motor vehicle is not conclusory proof of ownership of that motor vehicle, but is only an indicia of ownership which can be rebutted by competent evidence." *In re Propps*, 118 B.R. 376, 378 (Bankr. D. S.C. 1989), citing *Farrelly v. Heuacker*, 118 Fla. 340, 159 So. 24 (1935), and *In Re: Collins*, 5 B.R. 56 (Bankr. N.D. Fla. 1980). *Cf. Brevard Co. Sheriff's Office v. Baggett*, 4 So.3d 67, 70 (Fla. 5th DCA 2009) (affidavit sufficient to establish that truck was registered to wife "in name only" and that husband "was, in fact, the actual owner" subjecting truck to forfeiture due to husband's drug activities).

A title is not always conclusive, because courts recognize that it is not uncommon to register vehicles in the name of someone other than the true owner. *See United States v. Cherek*, 734 F.2d 1248, 1254 (7th Cir. 1984) ("We are not unmindful of cases in which ownership of an automobile has been determined legally to be in someone other than the registered title owner."). *See, e.g., Propps*, 118 B.R. at 378-79 (although Florida title to vehicle was in debtor's name, third party rebutted presumption of ownership and established he was the "actual owner" since he paid for it and maintained possession of it); *Sommer v. Bernstein*, 28 B.R. 95 (Bkrtcy. D. Colo. 1983) (holding that vehicle purchased by debtor's son with his own funds but titled in the name of the debtor was not property of the debtor's estate, even though

-11-

debtor failed to change the title after the son reached the age of contractual majority). *Cf. In re Siefaff*, 164 B.R. 560, 567-68 (Bankr. W.D. Mich. 1994) (vehicle titled in the name of the debtor's father deemed property of the debtor where debtor had exclusive use of the vehicle, made "all or substantially of the motor vehicle installment payments" and was listed as the insured on the vehicle's insurance policy).

The testimony at the bankruptcy hearings established that, although the Jeep may have been technically titled in the Defendant's name, he did not "own" it. He did not pay for it; he was just one of many family members who sometimes drove it; for most of the relevant time period, the vehicle was used by his aunt and uncle in St. Augustine and who were listed on the vehicle's insurance policies. Therefore, the Defendant was not, contrary to the Indictment, the "owner" of the Jeep for purposes of the SOFA as a matter of law.

## B.   Materiality and Intent to Defraud

Section 152 prohibits only the knowing and fraudulent concealment of estate property and the knowing and fraudulent false statements about property of the estate.[8] The same is true of 11 U.S.C. § 727.[9] Both also require that any false

---

[8] Section 152 provides in pertinent part:

A person who–

(continued...)

statements be "material." *See Lindholm*, 24 F.3d at 1083 (citations omitted) (§ 152);

*United States v. Key*, 859 F.2d 1257, 1261(7th Cir. 1988) (same); *United States v.*

*Jackson*, 836 F.2d 324, 329 (7th Cir. 1987); *Chalik v. Moorefield (In re Chalik)*, 748

F.2d 616, 618 (11th Cir. 1984) (§ 727).

---

[8]/(...continued)

> **1)** knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;
>
> **2)** knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;
>
> ***
>
> **7)** in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation....

[9]/ Section 727(a)(2) provides:

> The court shall grant the debtor a discharge, unless...
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the debtor, after the date of the filing of the petition.

-13-

In the *civil* context of § 727, the majority rule is that a false oath about even worthless assets constitutes a material omission and precludes discharge of debts through the bankruptcy process. *See, e.g., Chalik*, 748 F.2d at 618 (citations omitted); *In re Berris*, 458 B.R. 601, 609 (Bkrtcy. S.D. Fla. 2011). *But see In re Bauder*, 333 B.R. 828, 832 & n. 18 (8th Cir. 2005) (debtor's failure to list ring valued at $300 "borderline immaterial," holding that "[t]he omission of property of trivial value is immaterial where debtors's testimony about value was uncontradicted). At least one circuit has applied this standard to § 152, purportedly because materiality does not require a showing that creditors were harmed. *Key*, 859 F.2d at 1260-61 (deceptive transfer of "worthless" corporations still deemed material).

As a threshold matter, we disagree that in the *criminal* context a debtor can be found guilty by failing, even willfully, to disclose a worthless or nearly worthless asset. It is one thing to deny a debtor discharge for failing to disclose such an asset, but it is quite another to send the debtor to prison for failing to do so – especially when the standard of proof in a criminal case is much higher than in a civil case – beyond a reasonable doubt.  In any event, the Trustee in this case himself informed the Defendant that he was only interested in the disclosure of assets worth more than $3,000. Accordingly, the Court should hold that the failure to disclose an asset valued at *half* that amount is immaterial as a matter of law in this case.

-14-

Morever, to be actionable, any false statement must also be made with the intent to defraud creditors. *See Chalik*, 748 F.2d at 618-19; *In re Parnes*, 200 B.R. 710, 713-14 (Bkrtcy. N.D. Ga. 1996). Although issues of intent are jury questions in most instances, where *no* rational jury could find that element as a matter of due process, *see generally Jackson v. Virginia*, 443 U.S. 307 (1979), the issue becomes a pure legal question. As numerous bankruptcy courts have concluded, even in the civil arena, "the size of the error may bear on whether intent exists." *Parnes*, 200 B.R. at 719-20 (failure to disclose life insurance policy with a $902.67 and checking account with a small balance, while material, was insufficient to prove intent to defraud). *See also Bauder*, 333 B.R. at 831 (trial court committed clear error in concluding that debtor intended to defraud creditors by not disclosing ring valued at only $300). *Cf. Guthrie*, 265 B.R. at 261-62 (no intent to misrepresent value of vehicle valued at $4000 when "blue book" value was $9,520 in part due to excess mileage and accident history of vehicle). *Compare Chalik*, 748 F.2d at 618 (concealment of assets in excess of $2.1 million and monthly income in excess of $250,000 sufficient to infer intent to defraud, even if undisclosed securities were valueless at the time).

Even if a mere intent to *deceive* creditors about a nearly worthless asset would be enough to deny a debtor discharge in civil bankruptcy, criminal fraud requires

-15-

more. The Eleventh Circuit recently held in construing the mail and wire fraud statutes a showing of deception alone is insufficient; rather the deception had to be committed with the intent to injure by depriving the victim of "'something of value.'" *United States v. Takhalov*, No. 13-12385, 2016 WL 3683456, at \*3 (11th Cir. July 11, 2016) (citation omitted).[10]

We respectfully submit that no rational jury could find that the Defendant intended to defraud creditors by not disclosing an asset valued at $1,500 where, as

---

[10] As the Eleventh Circuit explained:

> ...[T]here is a difference between deceiving and defrauding: to *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all. *See Black's* at 492 (defining the word "deception" as "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false"); *Webster's* at 585 (defining the word "deception" as "the act of deceiving, cheating, hoodwinking, misleading, or deluding"). Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding.

> For this reason, the law in the Eleventh Circuit makes clear that a defendant "schemes to defraud" only if he schemes to "depriv[e] [someone] of something of value by trick, deceit, chicane, or overreaching." *Bradley*, 644 F.3d at 1240. But if a defendant does not intend to harm the victim—"to obtain, by deceptive means, something to which [the defendant] is not entitled"—then he has not intended to defraud the victim. *Id.* ... For if there is no intent to harm, there can only be a scheme *to deceive*, but not one *to defraud*.

*Id.* (emphasis in original).

-16-

here, the debtor *did* disclose assets of approximately $2.5 million. Therefore, the Court should bar any prosecution predicated on the Jeep.

## III.   ENTRAPMENT BY ESTOPPEL

During the 341 creditors meeting on July 9, 2013, the Trustee personally and on the record informed the Defendant that he was only interested in learning about assets of "significant" value, defined by him as more than $3,000. During the subsequent hearing in December, documents were introduced establishing that the Jeep Wrangler in question was approximately 13 years old as of 2013, had been driven 149,495 miles and had been in four accidents. CarMax generously appraised the value of the Jeep as only $1,500 in a bankruptcy case in which the Defendant had disclosed $2,515,038.00 in assets. By any definition, the value of the Jeep was nominal at best, and was more likely worthless on an open market in light of its accident history. In any event, the CarMAX appraised value ($1,500) was *half* of the minimum value ($3,000) that the Trustee told the Defendant needed to be disclosed. Therefore, even assuming that the concealment of worthless assets or assets of nominal value would otherwise be "material," under the doctrine of entrapment by estoppel the Defendant had the right to rely on the Trustee's statement that nothing valued under $3,000 would be subject to disclosure in *his* bankruptcy case.

The doctrine of entrapment by estoppel is derived from three Supreme Court opinions: *Raley v. Ohio*, 360 U.S. 423 (1959); *Cox v. Louisiana*, 379 U.S. 536 (1965); and *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655 (1973). The doctrine prevents criminal prosecution "when the government affirmatively assures [a defendant] that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues." *United States v. Aquino-Charon*, 109 F.3d 936, 938-39 (4th Cir.) (citations omitted), *cert. denied*, 522 U.S. 931 (1997). The defense is predicated upon "principles of fairness rather than the defendant's mental state" and precludes criminal charges. *United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir. 1990).[11/]

Although courts have articulated the elements of entrapment by estoppel using slightly different terminology, all definitions appear to share three common elements. To assert the defense, a litigant must show: (1) a government official "acting with actual or apparent authority" (2) made an affirmative representation that the conduct was legal and (3) the defendant reasonably relied upon the representation. *Aquino-Charon*, 109 F.3d at 938-39; *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir.

_____

[11/] *See also United States v. Abcasis*, 45 F.3d 39, 43-45 (2d Cir. 1995); *United States v. Levin*, 973 F.463 (6th Cir. 1991);  *United States v. Tallmadge*, 829 F.2d 767 (9th Cir. 1987);  *United States v. Clegg*, 846 F.2d 1221, 1224 (9th Cir. 1988).

1994); *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 825 (9th Cir.), *cert. denied*, 471 U.S. 1139 (1985).

**Element One: A Government Official**:  The first element of the defense is plainly satisfied here. Both bankruptcy trustees and their attorneys are considered officers of the court. *United States v. Lawrence*, 573 F.3d 1265, 1269 (11th Cir. 2009), citing *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006). Indeed, for that reason, they share in the judiciary's absolute immunity from most lawsuits for conduct committed in that capacity. *In re McKenzie*, 716 F.3d 404, 412-13 (6th Cir. 2013) *Weissman v. Hassett*, 47 B.R. 462, 466 (Bnkr. S.D.N.Y. 1985); *Blum v. Campbell*, 355 F. Supp. 1220, 1224-25 (D. Md. 1972).

**Element Two: Affirmative Representation**:  While many attempts to invoke the entrapment by estoppel defense fail due to the absence of an affirmative representation by a government official or, in this case that is not an issue. The Trustee on the record unambiguously told the Defendant he was uninterested in assets valued under $3,000.

**Element Three: Reasonable Reliance**: Since the Trustee was an officer of the court in charge of the bankruptcy proceeding, it was reasonable for the Defendant to rely on the Trustee's express statement – a statement made to the Defendant in front of three major or their attorneys, none of whom disputed the Trustee's statement.

-19-

Since all the elements of entrapment by estoppel defense are satisfied, the Jeep charges should be dismissed or stricken for that reason as well. *See Levin*, 973 F.2d at 466 (affirming pretrial dismissal of indictment based on entrapment by estoppel).

## IV.  THE PERJURY TRAP

Even assuming *arguendo* that the Defendant's mis-statement about not holding title to the Jeep could be considered material and not subject to dismissal under the entrapment by estoppel doctrine, due process would still require dismissal because it seems clear that the Trustee's shift in focus from "ownership" to "title" was intentional, that he, in fact, had a copy of the registration, and deliberately refused to show it to the Defendant, despite his repeated requests, because the Trustee's tactics amounted to a forbidden perjury trap.

"A 'perjury trap' is broadly defined as a situation wherein the government calls a judicial or quasi-judicial proceeding ... in order to create an opportunity for perjury on matters that are not material or germane to a legitimate investigation. Jon Reidy, *et al.*, *An Alternative Justification for the Perjury Trap Defense*, 87 U. DET. MERCY L. REV. 179 (2010) (hereinafter REIDY). *See generally* Bennet L. Gershman, *"The Perjury Trap*,*"* 192 U. PA. L. REV. 624 (1981) (hereinafter "GERSHMAN"). Two distinct doctrines prohibit such conduct.

-20-

First,  it is a due process-based defense derived generally from entrapment law that prohibits, as a matter of law, government questioning where the primary purpose is not to elicit the truth but, the opposite, to obtain testimony to support perjury  or false statement charge.  *See United States v. Chen*, 933 F.2d 793, 797 (9th Cir. 1991). "The deliberate use of a judicial proceeding to secure perjured testimony" is "a concept in itself abhorrent." *United States v. Simone*, 627 F. Supp. 1264, 1268 (D. N.J. 1986). *See also United States v. Thayer*, 214 F. Supp. 929, 932 (D. Colo. 1963) (substantial likelihood that grand jury questioning conducted for improper purpose – to obtain a perjury indictment); *United States v. Cross*, 170 F. Supp. 303 (D.D.C. 1959) (reversing perjury conviction of witness called to testify before congressional committee). *See generally Jacobson v. United States*, 503 U.S. 540, 548 (1992) (recognizing that  entrapment can be established as a matter of law).

Second, it is a judicially-created defense designed to protect the integrity of the court's own processes from being abused by government officials. *See* REIDY, 87 U. DET. MERCY L. REV. at 181 ("perjury traps are more appropriately justified as an appeal to judicial integrity – relating particularly to judicial independence, the truth -seeking motivations of the judicial, and the empirical legitimacy of the judiciary"). The concern is that the independence and neutrality of the judiciary will be tarnished when the trap-setter uses the court processes, not for a "truth-seeking function," but

-21-

for a "falsity-seeking function." *Id.* at 187-88. Questioning conducted for such a purpose is not a legitimate function of a tribunal. *Brown v. United States*, 245 F.2d 549, 554 (8th Cir. 1957); *United States v. Caputo*, 633 F. Supp. 1479 (E.D. Pa. 1986), *rev'd on other grounds sub nom. United States v. Martino*, 825 F.2d 754 (3d Cir. 1987). "The courts may also look duplicitous and less trustworthy and, as a result, the public may think that the courts are an arm of law enforcement and because of this, courts may lose the stature in the eyes of the public needed for them to effectuate justice." REIDY, 87 U. DET. MERCY L. REV. at 188. *See Bursey v. United States*, 466 F.2d 1059, 1080 n. 10 (9th Cir. 1972) (using a grand jury to "coax a witness into the commission of perjury" constitutes "an abuse" of the grand jury's processes).

The defense is most frequently raised in the context of grand jury investigations. However, in that context, concepts of relevance and materiality are at their broadest due to the investigatory purpose of grand juries. *See United States v. Regan*, 103 F.3d 1072, 1079 (2d Cir. 1977) ("A statement in grand jury proceedings is material if a truthful answer *could conceivably have aided* the grand jury investigation.") (emphasis added). A bankruptcy proceeding has a far more limited purpose and, therefore, the scope of what is "material" substantially narrows. With this important difference in mind, GERSHMAN has identified several elements that are common to this strain of misconduct.

*First*, the questioner suspects the prospective witness of improper activity and has collected substantial proof of that activity *prior* to requiring the witness' attendance at the proceeding. GERSHMAN, at pp. 625, 662-64.[12] It seems clear here – although an evidentiary hearing is necessary to confirm it – that the Trustee had the Jeep's title in his back pocket and was deliberately withholding it from the Defendant to secure the false statements.

*Second*, perjury traps typically involve unusual tactics by the questioner executing them. GERSHMAN, at p. 652, 682, 657-73, 687-91. These tactics can include, among other things, the refusal during questioning to confront the witness with evidence contradicting his testimony.[13] That is, of course, exactly what

---

[12] *See, e.g., Brown*, 245 F.2d at 555 (before putting Brown into grand jury, prosecutor possessed sworn statements from all the parties and had caused others to testify in the grand jury about the events); *Thayer*, 214 F. Supp. at 933 (factors recognized as evincing perjury trap include "disparity of knowledge as between the Government and the accused"); *Cross*, 170 F. Supp. at 304 (Senate Subcommittee already had substantial evidence of Cross' involvement in activity, along with his prior denials of involvement, prior to requiring his testimony); *United States v. Icardi*, 140 F. Supp. 383 (D.D.C. 1956) (before summoning Icardi to testify before subcommittee of House of Representatives, subcommittee had all the information necessary to write its report but had received information that Icardi was responsible for homicide); *People v. Tyler*, 46 N.Y.2d 251, 385 N.E.2d 1224, 413 N.Y.S.2d 295 (1978) (agents had defendant under surveillance and had already testified in grand jury prior to seeking Tyler's testimony about meeting).

[13] *See, e.g., Tyler*, 46 N.Y.2d at 260, 385 N.E.2d at 1229, 413 N.Y.S.2d at 300 (in finding perjury trap, court found "critical" that "the prosecutor failed to confront the defendant or otherwise stimulate his memory, if only by limited cues, with some of

(continued...)

happened in this case during the October hearing where the Defendant indicated he was really not sure anymore about how the vehicle was titled and repeatedly asked the Trustee to show him the actual registration. Not only did the Trustee repeatedly refuse to do so but at one point misleadingly said to him: "I don't have any document *in front of me or in front of you right now* that says otherwise." *See* p. 8 *supra*.

> *Third*, the materiality of the question itself is frequently suspect.

> It is not properly a principal aim of the Grand Jury, however, to "create" new crimes in the course of its proceedings. Thus, where a prosecutor exhibits no palpable interest in eliciting facts material to a substantive investigation of crime or official misconduct and substantially tailors his questioning to extract a false answer a valid perjury prosecution should not lie...

*Tyler*, 385 N.E.2d at 1228.[14/] Here, the critical issue was whether the Defendant "owned" the car. While the identity of the title holder was a factor in the ownership analysis, it was not the determinative one. Yet, the Trust did not seem interested in discussing the other trappings of ownership and, instead, continually harped on the issue of title.

------------------------------------------------

[13/](...continued)
the contrary facts"); *People v. Monaghan*, 55 A.D.2d 1056, 391 N.Y.S. 2d 778 (1977) (dismissing perjury indictment where prosecutor called defendant, an old man, asked questions about events of several months earlier and did not attempt to refresh his recollection of events).

[14/] Thus, "questions that would satisfy the materiality standard of perjury statutes might nonetheless, when considered in conjunction with other circumstances of the case, contribute to an ultimate finding of prosecutorial bad faith." GERSHMAN, at 288.

*Fourth*, the questioner typically terminates the line of questioning once a false answer is obtained.  That too happened here. Once the Trustee got the Defendant to flatly deny having title to the Jeep, he repeatedly attempted to move on to other topics. It was the Defendant himself who then twice returned to the subject to seek clarification – clarification that the Trustee steadfastly refused to provide.[15/]

Accordingly, following the requested evidentiary hearing, the Court should conclude that the Trustee was engaged in a perjury trap with respect to his questioning about the Jeep's title.

## CONCLUSION

For all of the foregoing reasons, this prosecution, at least as to the Jeep, must be precluded.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Ph.:  (305) 371-6421 –  Fax: (305) 358-2006
E-mail: HSrebnick@RoyBlack.com

---

[15/] At this point, counsel does not know whether the Trustee was *already* in contact with the U.S. Attorney's Office prior to the October 2013 hearing. If so, that would add an additional factor to the analysis. *See United States v. Scrushy*, 366 F. Supp. 2d 1134, 1138-39 (N.D. Ala. 2005) (suppressing evidence where the government coordinated with the SEC to arrange a civil deposition to create a "perjury trap" for criminal prosecution purposes).

-25-

By:     /s/ Howard M. Srebnick
        HOWARD M. SREBNICK
        [Fla. Bar No. 919063]
        G. RICHARD STRAFER
        [Fla. Bar No. 389935]
        BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
        201 South Biscayne Boulevard, Suite 1300
        Miami, FL  33131
        Telephone: (305) 371-6421 Fax: (305) 358-2006


        /s John Hasan Ruiz
        JOHN HASAN RUIZ
        [Fla. Bar No. 928150]
        MSP RECOVERY LAW FIRM
        5000 S.W. 75th Ave., Suite 400
        Miami, FL 33155
        Telephone: (305) 614-2222
        E-mail: jruiz@msprecovery.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 1, 2016, a draft of this motion was emailed to AUSA Jonathan Osborne for his review in an attempt to resolve the issue and he advised that the government opposes the relief sought.

        /s/ Howard M. Srebnick

-26-